UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BEAR, STEARNS & CO. INC.,

          Plaintiff

**08 CA 10505 NMG**

-against-

DOUGLAS A. SHARON,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## PLAINTIFF BEAR, STEARNS & CO. INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION AND AN ORDER PERMITTING EXPEDITED DISCOVERY

This memorandum is respectfully submitted by Plaintiff Bear, Stearns & Co. Inc. ("Bear Stearns" or the "Company") in support of its Motion for a Temporary Restraining Order and a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure against Defendant Douglas A. Sharon ("Sharon" or "Defendant"). Bear Stearns also relies on the Affidavit of Ricardo S. Penafiel ("Penafiel Aff."), sworn to March 26, 2008 submitted herewith.[1]

For the reasons stated herein, Bear Stearns requires the immediate entry of provisional relief, pending rulings on the merits by an arbitration panel of duly-appointed arbitrators pursuant to Rule 13804 of the Code of Arbitration Procedure for Industry Disputes of the Financial Industry Regulatory Authority ("FINRA"), which was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. (the "NASD") and the member regulation, enforcement and arbitration functions of the New

---

[1] Bear Stearns submits concurrently with its Memorandum of Law an Appendix of unpublished court decisions.

York Stock Exchange, to (a) halt Defendant's violation of his 90-day written notice agreement with Bear Stearns; (b) to halt Defendant's use of Bear Stearns' confidential and proprietary client information; (c) to halt the solicitation by Defendant of Bear Stearns' clients utilizing Bear Stearns' confidential and proprietary client documents and information; and (d) to halt the solicitation of Bear Stearns' employees using Bear Stearns' confidential information.

## PRELIMINARY STATEMENT

This dispute arises from the abrupt resignation of Defendant - - the most senior Bear Stearns' executive in Bear Stearns' Boston, Massachusetts office - - on March 17, 2008. Sharon was the Branch Office Manager in Bear Stearns' Boston Office from July 1, 1998 until mid-2004 when he was promoted to Executive Director. Sharon was a Senior Managing Director since July 15, 1992. As such, Defendant was responsible for developing and maintaining private client relationships with high net worth individuals and their related businesses, corporations, institutions, trusts and other entities. In addition, as Executive Director of the Boston office, Sharon was responsible for recruiting, hiring and training brokers in the Boston office. In performing his job, Defendant was given access on a daily basis to very sensitive information concerning Bear Stearns' clients and was privy to sensitive information relating to commissions, production and revenue generated by each broker in the Boston office, as well as their client bases.

On the very same day he resigned from Bear Stearns, Defendant accepted employment with Bear Stearns' competitor, Morgan Stanley & Co., Inc. ("Morgan Stanley") in its Boston, Massachusetts office. In so doing, Defendant directly violated his agreement with Bear Stearns pursuant to which he expressly agreed to furnish Bear Stearns with 90-days notice in advance of his resignation from the firm.

2

In total disregard for his contractual and common law obligations to Bear Stearns, Defendant is engaged in a campaign to recruit Bear Stearns' financial advisors to join Morgan Stanley. Further, Defendant took Bear Stearns' highly confidential client files and trade secret customer lists with him to Morgan Stanley. Using Bear Stearns' confidential documents and information he then began soliciting Bear Stearns' clients to transfer their accounts from Bear Stearns to Morgan Stanley. In fact, Defendant, and his assistants, copied hundreds of pages of Bear Stearns customer information and other confidential documents immediately prior to his resignation. Even worse, the weekend before Defendant's resignation he was present in the Boston office when the employees printed so many thousands of client account statements that the office exhausted its entire storehouse of paper. As Executive Director, Defendant should not have permitted this concerted action by Bear Stearns employees to copy and remove confidential client information.

This application for injunctive relief arises from: (1) Defendant's violation of his express 90-day written notice provision contained in his terms of employment memorandum; (2) the misappropriation by Defendant of Bear Stearns' confidential and proprietary business and customer trade secret information in violation of his terms of employment memorandum and his common law obligations and (3) Defendant's improper solicitation of Bear Stearns' clients and employees using Bear Stearns' confidential and proprietary business and customer trade secret information in violation of his common law obligations.

Defendant's wrongdoing threatens Bear Stearns with irreparable harm in a variety of ways, including: (1) disclosure of Bear Stearns' trade secrets and confidential and proprietary information, including customer lists and business information; (2) loss of

3

confidentiality of customers' records and financial dealings, loss of customer confidence and trust, loss of goodwill, and loss of business reputation; (3) loss of personnel, damage to office morale and stability, and the undermining of office protocols and procedures; and (4) present economic loss, which is unascertainable at this time, and future economic loss, which is incalculable.

Recently, because of the extremely tumultuous financial markets, Bear Stearns found itself in difficult financial circumstances. Accordingly, on March 16, 2008, Bear Stearns' parent entity entered into a merger agreement with JPMorgan Chase & Co. Bear Stearns' competitors, such as Morgan Stanley, have taken advantage of the uncertainty caused by these events to lure away Bear Stearns' brokers with lucrative financial packages, without regard for their contractual and other obligations these brokers have to Bear Stearns. Bloomberg News, in an article titled "Hunting Season Opens for Bear Stearns Brokers" (a copy of which is annexed to the Penafiel Aff. as Exhibit E), has reported on this:

> [s]ome of the 550 brokers at the company who handle individual investors' accounts are receiving job offers from competitors promising bonuses of $2 million or more.
>
> These competitors, Merrill Lynch, Morgan Stanley, UBS and the Smith Barney unit of Citigroup, are offering Bear Stearns brokers packages that include signing bonuses two times as large as the annual revenue they bring in.

If the Bloomberg article is correct and, if Morgan Stanley offered Defendant twice his annual revenue in compensation to leave Bear Stearns, then Morgan Stanley would have offered Sharon approximately $10 million in transition compensation.

Bear Stearns seeks only to maintain the *status quo* until such time as an arbitration panel convened by FINRA Dispute Resolution can issue a decision on the merits. Contemporaneously herewith, Bear Stearns is commencing an arbitration with

FINRA against Defendant, in which Bear Stearns seeks, *inter alia*, permanent injunctive relief against Defendant.

## STATEMENT OF FACTS

The relevant facts are set forth in the accompanying Penafiel Affidavit and will not be repeated at length herein.

### A.   Defendant's Agreement With Bear Stearns

In connection with an increase in base pay and other consideration, on December 12, 2005, Sharon signed the Terms of Employment at Bear Stearns-United States Memorandum (the "Terms of Employment Memorandum") which: (i) obligates Sharon to provide 90-days written notice of his intention to leave (failure to provide which Sharon acknowledged would result in entitling Bear Stearns to injunctive relief); (ii) obligates Sharon to preserve the confidentiality of customer and Firm information; and (iii) renews Sharon's commitment to the confidentiality provisions implicit in Bear Stearns' Code of Business Conduct and Ethics.

The Terms of Employment Memorandum contains what is commonly known as a "garden leave" provision, which obliges Sharon to provide 90-days written notice prior to his resignation (the "Notice Period") and acknowledges Bear Stearns' entitlement to injunctive relief for Sharon's failure to comply with the Notice Period.   The Notice Period provision provides as follows:

> A notice provision of not less than 90 days - which means that although you remain an employee at will, if you decide to leave Bear Stearns you must give prior written notice of your intention to leave. Once notice is given, for the ensuing 90 days (or longer if you have a longer provision in a current agreement, such as an offer letter, memorandum of understanding or guarantee), Bear Stearns will pay your base salary, during which time you may be asked to perform all, some or none of your work duties in Bear Stearns' sole discretion. The notice period is enforceable by a temporary restraining order which Bear Stearns can enforce in court.

5

The Notice Period provision in the Terms of Employment Memorandum is an essential tool for Bear Stearns because it protects the firm from the disruption caused by the departure of senior executives like Sharon.  Sharon's long tenure as Branch Office Manager and Executive Director has given him access to confidential information relating to the brokers, including without limitation, their compensation, their clients, their production and their agreements with Bear Stearns.  Absent enforcement of the Notice Period, key high-level employees such as Defendant can cause significant harm by immediately joining a competitor and using this information to unfairly compete with Bear Stearns, as Sharon, upon information and belief, has done.  The Notice Period reduces the likelihood of the departing employee misappropriating confidential and proprietary documents and information and soliciting Bear Stearns employees and clients and provides Bear Stearns with a short "cooling off period" in which it can take steps to retain its employees without competition.

In the Terms of Employment Memorandum, Sharon also agreed to preserve the confidentiality of Bear Stearns' customer information, by agreeing to:

> A renewed commitment to maintain the confidentiality of customer and Firm information during and after the period of your employment at Bear Stearns, and a renewed commitment not to use, at any time, any such information to the detriment of Bear Stearns.

## B.    Defendant's Wrongdoing

On March 17, 2008 Sharon - - the Executive Director of Bear Stearns' Private Client Services Group in its Boston, Massachusetts office and the most senior executive in Bear Stearns' Boston office - - resigned from Bear Stearns and accepted an offer with Bear Stearns' direct competitor Morgan Stanley, where he began work the very same day. Defendant violated the express terms of his Terms of Employment Memorandum by failing to provide Bear Stearns with any prior notice of his resignation.  Sharon also took with him

to his new employer Bear Stearns' highly confidential client documents and information to be used for the benefit of his new employer to the detriment of Bear Stearns.

In blatant disregard for his contractual and common law obligations Defendant has used Bear Stearns' confidential client documents that he improperly absconded with to contact and solicit Bear Stearns' clients to transfer their business away from Bear Stearns and to Morgan Stanley.  Not only did Sharon violate his Terms of Employment Memorandum by failing to provide Bear Stearns with any notice of his resignation and by pirating away confidential client documents in efforts to solicit customers away from Bear Stearns, but Sharon is also contacting Bear Stearns' financial advisors in efforts to persuade them to join Morgan Stanley by using the knowledge that he obtained at Bear Stearns concerning the brokers' production and client base due to his senior management position.

Sharon entered the Bear Stearns' Boston office the weekend before he resigned and met with numerous Bear Stearns' account executives, many of whom have since departed.  Between Friday and Sunday nights, Sharon and several Bear Stearns' account executives printed out many thousands of client account statements to enable him or his confederates to solicit these clients to transfer their accounts to Morgan Stanley in violation of his legal and contractual duties.    On information and belief, upon joining Morgan Stanley, Defendant immediately began soliciting by telephone, e-mail and overnight correspondence Bear Stearns' customers by utilizing Bear Stearns' confidential trade secret client information and documents.

## ARGUMENT

### BEAR STEARNS IS ENTITLED TO A TEMPORARY
### RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF

Contemporaneously with the commencement of this action, Bear Stearns is

in the process of initiating an arbitration proceeding against Defendant before the Financial Industry Regulatory Authority ("FINRA") seeking permanent injunctive relief.[2] Pending final determination in arbitration, Bear Stearns is expressly entitled to seek preliminary injunctive relief from this Court, even though the merits of the dispute between the parties ultimately will be resolved in arbitration.[3]  As recently confirmed by the First Circuit, "a district court has jurisdiction to issue preliminary injunctions to preserve the status quo pending arbitration." Puerto Rico Hosp. Supply, Inc. v. Boston Scientific Corp., 426 F.3d 503, 505 (1st Cir. 2005). Numerous other federal courts are in accord. See, e.g., PMS Distributing Co., Inc., v. Huber & Suhner, A.G., 863 F.2d 639, 642 (9th Cir. 1988); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung, 2001 WL 283083 (C.D. Cal. 2001) (Appendix, Tab 10) (granting preliminary injunction to preserve the status quo in arbitrable dispute pending final determination of merits of dispute in arbitration); American Express Financial Advisors v. Makarawicz, 122 F.3d 936, 940 (11th Cir. 1997); Blumenthal and Fein v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1051-52 (2d Cir. 1990); Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 812-13 (3d Cir. 1989); and Teradyne, Inc. v. Mostek Corp. 797 F.2d 43 (1st Cir. 1986). See also American Express Financial Advisors, Inc. v. Scott, 955 F. Supp. 688, 694 (N.D. Tex. 1996); Morgan Stanley DW Inc. v. Planck, 2007 WL 174148, at *1 (S.D. Fla. Jan. 19, 2007) (Appendix, Tab 1); and Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn, 191 F. Supp. 2d 1346,1350 (M.D. Fla. 2002).

In determining whether to issue a preliminary injunction, the United States

---

[2]  FINRA was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. ("NASD") and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.

[3]  Rule 13804 of the NASD Code of Arbitration Procedure for Industry Disputes requires a party seeking interim injunctive relief to obtain such relief from a court of competent jurisdiction.  A copy of this rule is annexed to the Penafiel Aff. as Exhibit A.

District Court for the District of Massachusetts requires the moving party to make a clear showing of: (1) the movant's likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is not granted; (3) a comparison between the harm to the movant if no injunction issues and the harm to the objectors if one does issue; and (4) the effect of the ruling on the public interest. "'The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" Patriot Funding, LLC v. Lefort, 2006 WL 1704262, 1 (D.Mass. 2006) (Appendix, Tab 2); Thermo Web Systems, Inc. v. Beebe, 2000 WL 1876418, 2 (D. Mass. 2000) (Appendix, Tab 12).

Bear Stearns is entitled to an injunction because it can establish that it has a likelihood of success on the merits, it will suffer irreparable harm absent an injunction, the harm to it greatly outweighs any potential harm to Defendant, and the effect of enjoining Defendant from breaching his contractual and common law obligations to Bear Stearns will serve the public interest. See generally Cote-Whiteacre v. Dept. of Public Health, 446 Mass. 350, *4 (Mass. 2006); Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 851 (Mass. 2004); Shipley Co. v. Kozlowski, 926 F. Supp. 28, 29 (D. Mass. 1996).

Massachusetts courts have long recognized a company's legitimate business interest in its trade secrets, including its customer information and client list. See Patriot Funding, LLC v. Lefort, supra, 2006 WL 1704262 at 2-3 (Appendix, Tab 2) ("Massachusetts common law restricts an at-will employee's ability to appropriate certain information held by the employer. An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. . . There are, however, certain limitations on the conduct of an employee who plans to

compete with his employer.  He may not appropriate his employer's trade secrets . . . and he may not carry away certain information, such as lists of customers."  See also Morgan Stanley DW, Inc. v. Clayson, 19 Mass. L. Rptr. 201 (Mass. Super. 2005) (Appendix, Tab 5); All Stainless Inc. v. Colby, 364 Mass. 773, 779 308 N.E.2d 481 (Mass. 1974); National Hearing Aid Centers v. Avers, 2 Mass. App. Ct. 285, 290 (Mass. App. 1974) (employer's customer list is confidential information when described as such in contract with defendant employee); Acorida Northeast Inc. v. Academic Risk Resources & Ins., 19 Mass. L. Rptr. 75, *4 (Mass. Super. 2005) (Appendix, Tab 6); Fortune Personnel Consultants v. Hagopian, 1997 WL 796494, *2-3 (Mass.Super 1997) (Appendix, Tab 16).

Similarly, courts throughout the country, considering circumstances similar to those here, repeatedly have granted securities firms injunctive relief to protect the misappropriation of confidential and trade secret information prior to an adjudication on the merits.  See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hegarty, 2 F.3d 405 (11th Cir. 1993), aff'd w/o opinion Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty, 808 F. Supp. 1555 (S.D. Fla. 1992); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano, 999 F.2d 211 (7th Cir. 1993); Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 948 F.2d 128 (5th Cir. 1991) (per curiam), aff'd, 777 F. Supp. 1349 (N.D. Tex. 1991); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton, 844 F.2d 72 (10th Cir. 1986); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048 (4th Cir. 1985); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham, 658 F. 2d 1098 (5th Cir. 1981); see also Merrill Lynch v. Napolitano, 85 F. Supp. 2d 491, 492-93 (E.D. Pa. 2000).  In view of the consistency with which courts have enforced contractual obligations and prohibited the misappropriation of trade secrets similar to those at issue, Bear Stearns' right to such relief cannot be gainsaid.

I.    **BEAR STEARNS IS LIKELY TO PREVAIL ON THE MERITS**

Bear Stearns is entitled to a temporary restraining order and preliminary injunctive relief, because Defendant has (a) violated the express terms of his Terms of Employment Memorandum by resigning from Bear Stearns without furnishing it with the requisite 90-days notice; (b) misappropriated Bear Stearns' confidential trade secret customer documents and by doing so has violated his common law obligations and the confidentiality clause contained in his Terms of Employment Memorandum; (c) unlawfully utilized the documents he misappropriated from Bear Stearns to solicit Bear Stearns' customers to cease doing business with Bear Stearns; and (d) improperly solicited Bear Stearns' employees to leave Bear Stearns employ and join its direct competitor – Morgan Stanley.

A.    **Misappropriation Of Trade Secrets And Solicitation
      Of Bear Stearns' Clients**

Defendant has breached the language barring him from disseminating or making use of Bear Stearns' confidential information, including but not limited to client account lists and records and has breached the provision requiring him to provide Bear Stearns with 90-days notice in advance of his resignation.  Massachusetts law enforces restrictive covenants intended to protect an employer's relationship with its clients. All Stainless Inc. v. Colby, 364 Mass. 773, 779 308 N.E.2d 481 (Mass. 1974); National Hearing Aid Centers v. Avers, 2 Mass. App. Ct. 285, 290 (Mass. App. 1974)(employer's customer list is confidential information when described as such in contract with defendant employee);  Acorida Northeast Inc. v. Academic Risk Resources & Ins., 19 Mass. L. Rptr. 75, *4 (Mass. Super. 2005) (Appendix, Tab 6); Fortune Personnel Consultants v. Hagopian, 1997 WL 796494, *2-3 (Mass. Super 1997)[4] (Appendix, Tab 16).

---

[4]    The restrictive covenant and confidentiality provision here satisfy the prerequisites

11

Massachusetts regularly grants injunctive relief to protect the type of confidential client and customer lists sought to be protected here and to prevent former employees from using such misappropriated documents to improperly solicit customers. See Patriot Funding, LLC v. Lefort, 2006 WL 1704262, 2-3 (D. Mass 2006) (Appendix, Tab 2). In Patriot the United States District Court for the District of Massachusetts ordered that defendant employee be enjoined from using his former employers trade secrets or confidential information, including its customer lists and from soliciting or attempting to solicit his former employer's customers. In finding that the plaintiff established a likelihood of success on the merits, the District Court held that even if the defendant was not subject to contractual restrictions, "Massachusetts common law still restricts an at-will employee's ability to appropriate certain information held by the employer . . . [a former employee] may not appropriate his employer's trade secrets. He may not solicit his employer's customers while still working for his employer .., **and he may not carry away certain information, such as lists of customers.**" Id. (emphasis added). See also Modis, Inc. v. Revolution Group, Ltd., 11 Mass. Rptr. 246, *8-9 (Mass. Super. 1999) (Appendix, Tab 13); Kroger v. Stop & Shop Companies, Inc., 13 Mass. App. Ct. 310, 316-18 (Mass. App. 1982); All Stainless Inc. v. Colby, 364 Mass. 773, 308 N.E.2d 481 (Mass. 1974)(restrictive covenant valid to protect businesses' good will where former employees close association with firm's

---

Massachusetts courts require to enforce their validity: 1) reasonably limited in time and space; 2) necessary to protect a legitimate business interest; 3) consonant with the public interest; and 4) supported by reasonable consideration  Boulanger v. Dunkin Donuts Inc., 442 Mass. 635, 639, 815 N.E.2d 572, 577 (Mass. 2004); American Stop Loss Ins. Brokerage Services v. Prince, 12 Mass. L. Rptr. 650, *3 (Mass.Super.2001) (Appendix, Tab 9).

clients may lead clients to confuse the two); Alexander & Alexander, Inc. v. Danahy, 21

Mass .App. Ct. 488, 497 (Mass. App. 1986)5

As detailed in the accompanying Penefiel Affidavit, Bear Stearns employs

reasonable efforts to maintain the confidentiality of its records. Bear Stearns has

implemented numerous internal policies to ensure the confidentiality of its customer

information.  For example, access to Bear Stearns' computer network by employees is

password-protected.  Maintaining the confidences of its clients is critical to Bear Stearns'

business. Accordingly, Bear Stearns' employees, including Defendant, are required to sign

a confidentiality agreement with Bear Stearns whereby the employees agree not to use or

exploit Bear Stearns' customer records other than in the normal course of Bear Stearns'

business.  Indeed, the extraordinary clandestine steps Defendant took to print out client

account information over a week-end testifies to his awareness of the information's

confidentiality and the malfeasance in which he was engaged.

Indeed, Bear Stearns has no other means to prevent Defendant from using

this confidential and proprietary information for Morgan Stanley's and their own benefit.

See Jensen Tools v. Contact East, Inc, 1992 WL 245693, *2 (D. Mass. 1992) (Appendix,

Tab 20) ("Massachusetts law recognizes that a plaintiff may obtain relief from a defendant

who wrongfully acquires plaintiff's confidential information, even if the information fails to

---

[5] Consistent with Massachusetts law, courts throughout the country consistently have held
securities firms' customer lists to be trade secrets protectable by the injunctive relief Bear
Stearns seeks herein.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Davis, 1998 WL
920328, at *1 (N.D. Tex. Aff. 30, 1998) (Appendix, Tab 14) ("This court has routinely held
that Merrill Lynch's customer lists qualify as trade secrets"); Merrill Lynch, Pierce, Fenner &
Smith, Inc. v. Cross, 1998 WL 122780, at *2 (N.D. Ill. Mar. 13, 1998) (Appendix, Tab 15)
("Customer lists are entitled to trade secret protection under Illinois law."); Merrill Lynch,
Pierce, Fenner & Smith, Inc. v. Zimmerman, 1996 WL 707107, at *2 (D. Kan. Oct. 1, 1996)
(Appendix, Tab 17); Orbach v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1994 WL
900431 at *6 (E.D. Mich. Jan. 11, 1994) (Appendix, Tab 18); Merrill Lynch, Pierce, Fenner
& Smith, Inc. v. Kramer, 816 F. Supp. 1242, 1246 (N.D. Ohio 1992); Merrill Lynch, Pierce,
Fenner & Smith, Inc. v. Hagerty, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992), aff'd, 2 F.3d

qualify for protection as a trade secret."); <u>Jensen Tools</u>, 1992 WL 245693 at *2 (Appendix, Tab 20); <u>see also</u> <u>Jet Spray Cooler, Inc. v. Crampton</u>, 361 Mass. 835, 839-40, 282 N.E.2d 921, 924 (1972) ("Indeed, the duty not to use confidential information is not limited to technical trade secrets. '[I]t matters not, in such cases, whether the secrets be secrets of trade or secrets of title, or any other secrets of the party important to his interest.'")

As such, Bear Stearns is likely to succeed on the merits in establishing that Defendant improperly misappropriated its trade secret documents and information and improperly utilized such misappropriated documents and information to solicit Bear Stearns' customers to cease doing business with Bear Stearns and instead begin doing business with Morgan Stanley.   Defendant's conduct patently violates his Terms of Employment Memorandum and his common law obligations to Bear Stearns.

### B.   Violation Of The Notice Provision Of The Terms of Employment Memorandum

Defendant violated the language in his Terms of Employment Memorandum which obligated him to give Bear Stearns "written notice at least 90 days prior to the effective date" of his resignation in exchange for substantial monetary compensation and Bear Stearns' agreement that it would pay Defendant his base salary during those 90 days. During this 90-day period Defendant is obligated to continue its duty of loyalty to Bear Stearns and act in good faith.   Accordingly, Defendant is prohibited from soliciting Bear Stearns' employees and customers to move to Morgan Stanley during the Notice Period.

This type of restrictive covenant, which is called a "garden leave" covenant,

> requires that the employee [here, Defendant,] provide the employer [here, Bear Stearns,] with a specific, reasonably long period of notice before terminating the employment.  During this time, the employer cannot force the employee to do any work, but the employee is paid his full salary and benefits.  Since the

405 (11th Cir. 1993).

employee remains an "employee," however, he cannot go to
work for a competitor or do anything else to harm the employer.
This arrangement provides employers with the protection they
need, is fair to employees, and has been generally accepted
and enforced by the English courts.

Greg T. Lembrich, Note, Garden Leave: A Possible Solution to the Uncertain

Enforceability of Restrictive Employment Covenants, 102 Colum. L. Rev. 2291, 2292

(2002).

The provision is designed to persuade the court to enforce Defendant's

restrictive covenant because the 90-days of compensation Defendant receives eliminates

any harm he might suffer. Marcam Corp. v. Orchard, 885 F. Supp. 294, 296 (D. Mass.

1995) (employer offered to pay former employee 110 percent of the salary offered by the

competitor during the restricted year). Indeed, Defendant still would receive his salary as

he assisted Bear Stearns in its transition of its client accounts to new account executives.

As a consequence, enjoining Defendant from continuing to breach his obligations will not

impose a hardship on them. He will receive his salary for the full 90-day period the notice

provision provides for. Sentient Jet Inc. v. Lambert, 15 Mass. L. Rptr. 500, *6 (Mass.

Super. 2002) (Appendix, Tab 8); Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280,

289-90 (Mass. 1974).                          Indeed, the facts in the instant case are

similar to those in Marcam. The garden leave provision at issue here is necessary and

should be enforced because Defendant's position at Bear Stearns was "unique." In

performing his duties, Defendant was given access on a daily basis to very sensitive

information concerning Bear Stearns' clients. As such, this is not a case where a low-level

employee is precluded, by a standard-form agreement and without compensation, from

being able to earn a livelihood. To the contrary, Bear Stearns asks this Court to enforce an

explicit, narrowly-drawn garden leave provision against the most senior member of its

Private Client Services group in Boston, Massachusetts.   Holding Defendant to his agreement would not work any hardship on him.  The restrictive covenant only precludes Defendant, after all, from working for a direct competitor for 90 days, during which time Bear Stearns has agreed to pay their salary. Boulanger v. Dunkin Donuts Inc., 442 Mass. 635, 639, 815 N.E.2d 572, 577 (Mass. 2004); American Stop Loss Ins. Brokerage Services v. Prince, 12 Mass. L. Rptr. 650, *3 (Mass.Super.2001) (Appendix, Tab 9). See also Estee Lauder Cos. Inc. v. Batra, 430 F. Supp. 2d 158, 181 (S.D.N.Y. 2006)("An additional factor courts will look to in evaluating the reasonableness of a restrictive covenant is whether an employee receives continued consideration for his loyalty and good will."); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 472 (S.D.N.Y. 2001)(defendant "will continue to receive his salary during the ninety day notice period and the three month sitting-out period... The relationships previously developed with customers can be renewed after that time.'"); Bradford v. New York Times Co., 501 F.2d 51, 58 (2d Cir. 1974)("There is more flexibility in the first two categories, the first one of which involves a covenant barring an employee from competing while employed, in determining whether or not the covenant is reasonable because the employee. . . is receiving some consideration for the covenant -- his salary is being paid" After resigning, the employee in Bradford "was to receive annual installments of stock for a ten-year period so long as he abided by his promise not to compete."); Nike, Inc. v. McCarthy, 379 F.3d 576, 587 (9th Cir. 2004)("Nike is obligated under the covenant not to compete to pay McCarthy his full salary during the restriction period.").

Accordingly, Bear Stearns is likely to succeed on the merits in establishing that Defendant has breached his Terms of Employment Memorandum by failing to provide Bear Stearns with 90-days notice of his resignation and by soliciting Bear Stearns' employees and clients to terminate their relationship with Bear Stearns and join Morgan

Stanley in violation of his fiduciary duty and duty of loyalty owed to Bear Stearns during the Notice Period.

## C.    Improper Solicitation Of Employees

Bear Stearns is entitled to injunctive relief to prevent Defendant's improper solicitation of Bear Stearns' employees using the confidential and proprietary information he learned by virtue of his position as Executive Director and formerly as Branch Office Manager of the Boston office. Such conduct not only violates the Terms of Employment Memorandum but is a breach of Defendant's duty of loyalty and fiduciary duty to Bear Stearns.

Under well-established Massachusetts law, "employees occupying positions of trust and confidence owe a duty of loyalty to [their] employer and must protect [the] interests of [their] employer." Orkin Exterminating Co., Inc. v. Rathje, 72 F.3d 206, 207 (1st Cir. 1995); In Re Tri-Star Technologies Co., Inc. 257 B.R. 629, 637 (D.Mass. 2001). As Executive Director, Defendant owed Bear Stearns an undivided duty of loyalty and fiduciary duty. Massachusetts law prohibits "an executive employee" from "actively competing with his employer during the tenure of his employment, even in the absence of an express covenant so provided." Orkin, supra, 72. F.3d at 207.

Defendant has breached his duty of undivided loyalty and his fiduciary duty to Bear Stearns by utilizing confidential information learned by virtue of his executive position at Bear Stearns to recruit Bear Stearns' employees to leave Bear Stearns and join Morgan Stanley. The precise behavior at issue was addressed in Bancroft-Whitney Co. v. Glen, 64 Cal.2d 327, 347-48, 49 Cal. Rptr. 825 (1966), where the California Supreme Court determined that defendant breached his fiduciary duties to plaintiff (his employer), in part by engaging in conduct designed to obtain for plaintiff's competitor certain employees of

plaintiff.  See also McRoberts Protective Agency v. Landsdell Protective Agency, 61 A.D.2d 652, 654-55, 403 N.Y.S.2d 511, 513 (1st Dep't 1978) (citing wrongful solicitation by former employees as part of a pattern of unfair competition); Frederick Chusid & Co. v. Marshall Leeman & Co., 326 F. Supp. 1043, 1060 (S.D.N.Y. 1971) (hiring employees was improper "because defendants made use of information as to them obtained while [the defendants] were employed by [the former employer]").

## II.     Bear Stearns Will Suffer Irreparable Harm Absent Injunctive Relief

Bear Stearns will undoubtedly suffer irreparable harm if no injunctive relief is granted.  Courts deem harm to be irreparable in equity where the court will not be able to redress the damages by a monetary award.  Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003); accord Belkin v. Levenson, 19 Mass. L. Rptr 621, *1 (Mass. Super. 2005) (Appendix, Tab 4).

Bear Stearns has demonstrated that, in the absence of injunctive relief, it will sustain the sort of irreparable injury described above in multiple respects.  First, loss of trade secrets constitutes an irreparable harm because a trade secret, once lost, is gone forever.  TouchPoint Solutions, Inc. v. Eastman Kodak Co, 345 F. Supp. 2d 23, 32 (D. Mass. 2004). Secondly, irreparable harm lies, in part, in the fact that Bear Stearns' clients expect their financial information, their market transactions, and their investment assets to be known only to themselves, Bear Stearns and Bear Stearns' registered representatives. As one court observed, "[i]rreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they discover that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, will lose trust and confidence in Merrill Lynch." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer, 816 F. Supp. 1242, 1247 (N.D. Ohio 1992); See also Oxford Global Resources Inc

v. Guerriero, 2003 WL 23112398, *11 (Mass. 2003) (Appendix, Tab 7);  Kroger v. Stop &

Shop Co., 13 Mass. App. Ct. 310, 322 (1982); Modis, Inc. v. Revolution Group, Ltd., 11

Mass. L.Rptr. 246, *9 (Mass. Super. 1999) (Appendix, Tab 13).   Numerous courts have

relied upon the preceding factor to find irreparable harm justifying an injunction.  See, e.g.,

Systematic Business Services, Inc. v. Bratten, 162 S.W.3d 41, 51 (W.D. Mo. 2005) ("The

former employer need not show actual damages to enforce the covenant if the covenant is

lawful and the opportunity to influence employer's customers exists.");  Merrill Lynch,

Pierce, Fenner Smith, Inc. v. Rodger, 75 F. Supp. 2d 375, 381-82 (M.D. Pa. 1999) (the

court found irreparable harm because "customers will lose trust and confidence in [Merrill

Lynch] if they discover that ex-employees have divulged to others private financial

information like account value, market transactions and investment assets.");   Merrill

Lynch, Pierce, Fenner & Smith, Inc. v. Kramer, 816 F. Supp. 1242, 1247 (N.D. Oh. 1992)

("[i]rreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they

discover that their financial information, market transactions, and investment assets which

they presumed were held in confidence have been disclosed, will lose trust and confidence

in Merrill Lynch."); Sigma Chemical Co. v. Harris, 586 F. Supp. 704 (D.C. Mo. 1984) ("the

equities do not favor defendant due to the evidence that defendant's breach of the

restrictive covenant was willful").

Thirdly, it is impossible to determine the extent of Bear Stearns's future

economic loss, in the absence of an injunction.  Bear Stearns has built a substantial

Private Client Service business over many years, which cannot be rebuilt overnight.

Defendant's malfeasance, however, has disrupted and injured Bear Stearns' relationships

with those clients, a number of whom may well succumb to Defendant's urging and sever

their relationships with Bear Stearns as a consequence.  It is not clear how profitable these

accounts would have been for Bear Stearns in the future.  Furthermore, many of these clients -- had they remained with Bear Stearns -- might have referred additional clients, as is often the case in the financial services industries. But it would be impossible to quantify the numbers of potential referrals, or the future profitability of such referral business.  In sum, Bear Stearns cannot begin at this time to quantify those figures.  Suffice to say, Bear Stearns will sustain incalculable losses unless   this Court enjoins Defendant's wrongdoing.

Finally, Bear Stearns is suffering irreparable harm, because Defendant has violated the provision of his Terms of Employment Memorandum requiring Defendant to provide 90-day notice of his resignation to Bear Stearns. This provision is designed to protect Bear Stearns from the damaging effects of a senior executive's departure from the firm and provide it with a brief "cooling off period" which Bear Stearns can never get back once the provision is violated.  Massachusetts Courts have long established that when, as Defendant has here, an employee violates a restrictive covenant, the task of quantifying damages is difficult and elusive, and thereby mandates the award of an injunction instead. Marcam Corp. v. Orchard, 885 F.Supp. 294, 297 (D. Mass. 1995); Oxford Global Resources Inc v. Guerriero,  2003 WL 23112398, *11 (Mass. 2003) (Appendix, Tab 7); Kroger v. Stop & Shop Co., 13 Mass. App. Ct. 310, 322 (1982); Modis, Inc. v. Revolution Group, Ltd., 11 Mass. L.Rptr. 246, *9 (Mass. Super. 1999) (Appendix, Tab 13).

Not surprisingly, then, courts across the country have granted injunctive relief in circumstances similar to those presented here.  See, e.g., Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 777 F. Supp. 1349, 1354 (N.D. Tex. 1991), aff'd, 948 F.2d 128 (5th Cir. 1991); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham, 658 F.2d 1098, 1102-03 (5th Cir. 1981); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Davis, 1998 WL

920328, *3-4 (N.D. Tex. Aff. 30, 1998) (Appendix, Tab 14); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wright, 1993 WL 13036199, *3-4 (N.D. Tex. July, 2 1993) (Appendix, Tab 19); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano, 999 F.2d 211, 215 (7th Cir. 1993); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton, 844 F.2d 726, 727-28 (10th Cir. 1986); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1055 (4th Cir. 1985); Friedman, Clark & Shapiro, Inc. v. Greenberg, Grant & Richards, Inc., 2001 WL 1136169 (Tex. App. Houston [14 Dist.] 2001) (Appendix, Tab 11). In view of the consistency with which courts have enforced restrictive covenants similar to those at issue, Bear Stearns' right to such relief cannot be seriously disputed.

Without an order enjoining Defendant until a FINRA arbitration panel can hear and decide Bear Stearns claims, any award of FINRA will be ineffective. Once FINRA determines that Defendant's agreement and common law duties barred him from filching Bear Stearns' clients, employees and confidential and proprietary information, it will be difficult, if not impossible to sort out Bear Stearns' rights to equitable and legal relief. Once Morgan Stanley has secured Bear Stearns' clients, Bear Stearns will not be able to retrieve them. We do not yet know the financial damage caused to Bear Stearns by Defendant's wrongdoing. His misconduct has disrupted and injured Bear Stearns' relationships with its clients and employees, a number of who may well succumb to Defendant's urging and may terminate their relationships with Bear Stearns forever.

## III.     The Benefits to Bear Stearns Outweigh Any Potential Hardship to Defendant

The benefit of injunctive relief to Bear Stearns far outweighs any detriment to Defendant.  On the one hand, an injunction would safeguard Bear Stearns' goodwill, business reputation, trade secrets, methods of business operation and contractual rights. Most important, however, an injunction would protect Bear Stearns from piracy of its highly

sought after skilled employees who have confidential trade secret information. By contrast, Defendant has deliberately breached his contractual commitments to Bear Stearns by blatantly ignoring the 90-day Notice Period, by inducing or assisting to induce Bear Stearns' customers and employees to join him at Morgan Stanley; and by misappropriating Bear Stearns' trade secrets. Equity does not favor a party who is seeking not only to violate his contractual obligations, but also his fiduciary duty to his former employer. See Marcam Corp. v. Orchard, 855 F. Supp. 294 (D. Mass. 1995); Atlas Box and Crating Co., Inc. v. Valerus, 2005 WL 3721353, *3 (Mass .Super. 2005) (Appendix, Tab 3); IDS Financial Services v. SunAmerica, Inc., 958 F. Supp. 1258, 1282 (N.D. Ill. 1997) (the public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior), aff'd in part, vac. in part on other grounds, 136 F.3d 537 7th Cir. 1998.

Bear Stearns only seeks to compel Defendant to honor his contractual obligations by refraining from joining another employer for 90 days and refraining from soliciting Bear Stearns' clients (and employees) through their use of confidential information and trade secrets he misappropriated from Bear Stearns. Defendant will be precluded from engaging in his chosen profession for only 90 days, during which time Bear Stearns has agreed to pay and will pay his salary pursuant to the Terms of Employment Memorandum.  Prohibiting Defendant from utilizing Bear Stearns confidential and proprietary information pending the disposition of this case in arbitration will not prejudice Defendant, but rather shall preserve the status quo. Skidmore v. W.R. Grace & Co., 61 Mass.App.Ct. 1104, 807 N.E.2d 863 (Mass. App. Ct. 2004)

The balance of the equities, then, clearly weighs in Bear Stearns' favor and warrant an injunction accordingly.

## IV.    The Injunction Sought Serves The Public Interest

Granting the injunctive relief sought herein comports with the public interest in the enforcement of reasonable contractual restrictions and in protecting trade secrets. "Prohibiting the improper use of otherwise confidential information [is in the] public interest." Patriot Funding, LLC v. Lefort, supra, 2006 WL 1704262 at 3 (Appendix, Tab 2).

"'It is beneficial to the public that contracts for the partial restraint of trade be upheld to a reasonable extent.'" Oxford Global Resources, Inc. v. Guerriero, 2003 WL 23112398, 10 (D.Mass. 2003) (Appendix, Tab 7).  Other courts have widely recognized the public's interest in the enforcement of reasonable restrictive covenants and in "'the maintenance of standards of commercial ethics,'" Uniform Law Comment, Uniform Trade Secrets Act (quoting Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974)).  Accordingly, the public interest is served by issuance of the preliminary injunction Bear Stearns seeks.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Zimmerman, 1996 WL 707107, *3 (D. Kan. Oct. 1, 1996) (Appendix, Tab 17) ("[T]here is a strong public interest in favor of protecting trade secrets") (Appendix, Tab 14); Kramer, 816 F. Supp. at 1248 ("To deny injunctive relief in this case would . . . jeopardize the integrity of the securities industry and to the detriment of the public interest [and] . . . would cast doubt on the integrity of contractual agreements"); IDS Life Insurance Co. v. SunAmerica, Inc., 958 F. Supp. 1258, 1282 (N.D. Ill. 1997)(the public has an interest in preventing unfair competition, commercial piracy, misleading solicitations, and in safeguarding the confidentiality of financial records), aff'd in part, vac. in part on other grounds, 136 F.3d 537 7th Cir. 1998.

## CONCLUSION

For the reasons stated above, Bear Stearns respectfully requests that its

application for a Temporary Restraining Order and a Preliminary Injunction be granted.

Dated:   March 26, 2008

Respectfully submitted,

Michael B. Cosentino(BBO#558036)
SEEGEL, LIPSHUTZ, & WILCHINS LLC
20 William Street, Suite 130
Wellesley, MA 02481
Telephone No.  (781) 237-4400

Attorneys for Plaintiff
Bear, Stearns & Co. Inc.

Of Counsel:

PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100